**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

LAURA LOOMER,

        *Plaintiff*,

  v.

FACEBOOK, INC.,

        *Defendant*.

Case No. 9:19-cv-80893-RS

The Honorable Rodney Smith

**DEFENDANT FACEBOOK, INC.'S MOTION TO DISMISS
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)
AND INCORPORATED MEMORANDUM OF LAW**

GELBER SCHACHTER & GREENBERG, P.A.
Brian W. Toth
Natalia B. McGinn
1221 Brickell Avenue
Suite 2010
Miami, Florida 33131
Phone: (305) 728-0965
Fax: (305) 728-0951
btoth@gsgpa.com
nmcginn@gsgpa.com

DAVIS WRIGHT TREMAINE LLP
Laura R. Handman*
Alison Schary*
Chelsea T. Kelly*
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC 20006
Phone: (202) 973-4224
Fax: (202) 973-4450
laurahandman@dwt.com
alisonschary@dwt.com
chelseakelly@dwt.com

*Counsel for Defendant Facebook, Inc.*
*\*Admitted pro hac vice.*

## I.     INTRODUCTION

On May 2, 2019, Facebook removed Plaintiff Laura Loomer's accounts from its platform as part of its efforts to ban individuals and organizations that "amplify or traffic in hate."[1] Ms. Loomer already lost one lawsuit challenging Facebook's exercise of its editorial decisions. She now again asks a court to punish Facebook for deactivating her accounts, claiming Facebook defamed her when it explained the basis for its decision—that Ms. Loomer, along with others such as Louis Farrakhan and Alex Jones, violated Facebook's Dangerous Individuals and Organizations ("DIO") policy.  Ms. Loomer has failed to state a claim upon which relief can be granted.

*First*, Ms. Loomer has failed to allege a critical element of a defamation claim—that the challenged statements are false.  She claims Facebook labeled her as a "dangerous" person who promotes hate—yet, the First Amendment has long protected such statements because they are opinions that are not capable of being proven true or false.  Public news reports show Ms. Loomer has repeatedly and vehemently denounced Islam, calling it a "cancer on humanity," and has associated with individuals widely regarded as white nationalists.  The opinion that this or other conduct may mean she is "dangerous" or "promotes hate" is protected.  This is particularly so given that Facebook expressly disclosed the factors it considered in developing its opinions—leaving a reader to draw his or her own conclusions.  Nor can Ms. Loomer evade the opinion doctrine based on a tortured reading of Facebook's statements to create allegedly false "implications" that it did not make.

*Second*, Ms. Loomer, a self-described well-known activist, does not and cannot plead that Facebook acted with the requisite degree of fault.  Because she is a public figure, she must allege actual malice—that is, Facebook knew its statements were false or recklessly disregarded whether

---

[1] *See* Facebook Civil Rights Audit Progress Report, attached hereto as Exhibit 1, cited in Am. Compl. ¶ 27 and note 7.

they were false.  It is insufficient to allege in conclusory fashion, as Ms. Loomer has, that Facebook "knew that [it was] false and misleading" to call her "dangerous" or suggest that she "promoted . . . hate," or that it "at a minimum acted and published with a reckless disregard for the truth." Am. Compl. ¶¶ 29-31.  Nor can Ms. Loomer fix this fatal flaw through amendment.  Although she insists she does not "promote[] . . . hate" and is not "dangerous,"  this is clearly an issue where, at a minimum, reasonable minds can disagree—as demonstrated by Ms. Loomer's admission that other companies have banned her from their platforms for similar reasons.  Where, as here, the challenged statements are "one of a number of possible rational interpretations" of a situation that "bristle[s] with ambiguities," there can be no finding of actual malice because it is not possible to prove the defendant knew *its* interpretation was objectively false.  *Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971).  The Court should dismiss Ms. Loomer's claims for this independent reason.

*Third*, to the extent Ms. Loomer's claim targets Facebook's decision to deactivate her accounts, it is also deficient.  Under well-established law, neither Facebook nor any other publisher can be liable for failing to publish someone else's message.  The First Amendment provides absolute protection for such decisions.

The Court should dismiss the claims and do so promptly.  Permitting the case to proceed would not only discourage platforms from policing their services for objectionable content, but also undermine the "powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016).

## II.     BACKGROUND[2]

Ms. Loomer alleges she is a "well-known conservative investigative journalist" and "conservative Jewish female activist."  Am. Compl. ¶¶ 1, 2 (at 2).  On her website, http://lauraloomer.us (cited *id.* ¶ 20 n.4), she describes herself as a "Guerrilla-style" journalist who "often conducts ambush interviews on live stream," a tactic she calls "getting 'Loomered.'"[3]  Ms. Loomer often posts these videos to her website, as well as short articles about her political actions and topics such as "Islam in America."[4]

Facebook is the world's largest social media platform, with more than 2 billion users. Facebook prohibits its users from violating its Community Standards, including its Dangerous Individuals and Organizations ("DIO") policy, described in the Amended Complaint.  *See* Am. Compl. ¶ 9.  Under the DIO policy, on which the Amended Complaint relies, Facebook does not allow certain individuals and organizations to have a presence on its platform.[5]  Relevant here, the policy bars from Facebook organizations or individuals involved in "organized hate."  *Id*.  The policy defines a "hate organization" as "[a]ny association of three or more people that is organized under a name, sign, or symbol and that has an ideology, statements, or physical actions that attack

---

[2]  The facts set forth in this section are taken from the allegations of the Amended Complaint, documents cited or otherwise incorporated by reference into the Amended Complaint, and other information of which the Court may take judicial notice.  *See, e.g.*, *Turner v. Wells*, 879 F.3d 1254, 1272 & n.5 (11th Cir. 2018) (taking judicial notice of existence of videos and articles about defamation plaintiff, without considering them for the truth of the matters asserted) (citing *U.S. ex rel. Osheroff v. Humana, Inc*., 776 F.3d 805, 815 n.4 (11th Cir. 2015) (courts may take judicial notice of documents such as newspaper articles for a limited purpose, but not for determining the truth of those statements)).  Facebook asks the Court to take judicial notice of Facebook's DIO policy, Ms. Loomer's website, and the news articles described in Section II, but only for the fact of their existence, not the truth of the statements therein.

[3]  https://lauraloomer.us/press-kit/#.XXazeyhKiUk (Ex. 2).

[4]  https://lauraloomer.us/category/islam-in-america/#.XXazwChKiUk (Ex. 3).

[5]  A copy of the DIO policy is attached hereto as Exhibit 4.

3

individuals based on characteristics, including race, religious affiliation, nationality, ethnicity, gender, sex, sexual orientation, serious disease or disability." Ex. 4 at 2. The policy also states that Facebook does not permit "content that praises" or "coordination of support for" "any of the above organizations or individuals or any acts committed by them." *Id.* at 3.

In late 2018, Twitter banned Ms. Loomer for posting a tweet claiming Congresswoman Ilhan Omar was "anti Jewish." *See* Am. Compl. ¶ 12. Last year, Facebook temporarily suspended Ms. Loomer's account for violation of the DIO policy, prompting her to file a lawsuit in the District of Columbia, alleging, among other things, that Facebook conspired with other companies to suppress conservative viewpoints. On March 14, 2019, the court dismissed the claims, and Ms. Loomer appealed. *Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30, 34 (D.D.C. 2019), *appeal filed*, No. 19-7030 (D.C. Cir. Apr. 17, 2019). On May 2, 2019, Facebook permanently removed Ms. Loomer's accounts from its platforms, along with the accounts of Milo Yiannopoulos, Paul Joseph Watson, Paul Nehlen, Alex Jones, Louis Farrakhan, and InfoWars. Am. Compl. ¶ 5. On her website, Ms. Loomer calls herself the "most banned woman in the world," announcing that she has also been banned by PayPal, Lyft, GoFundMe, Venmo, Medium, TeeSpring, and Uber Eats,[6] as well as by the Conservative Political Action Conference after she harassed reporters at its March 2019 conference.[7]

Facebook's decision to remove these accounts drew widespread media coverage. Ms. Loomer relies upon and quotes from one of these articles in her Amended Complaint, a CNN report headlined "Louis Farrakhan, Alex Jones and Other 'Dangerous' Voices Banned by Facebook and Instagram" (attached hereto as Exhibit 7). *See* Am. Compl. ¶ 6, 8. The CNN Article

---

[6] https://lauraloomer.us/2019/05/02/i-am-now-the-most-banned-woman-in-the-world/#.XW3JbihKhPY (Ex. 5).

[7] https://lauraloomer.us/2019/03/02/breaking-cpac-bans-laura-loomer/#.XW3JKShKhPY (Ex. 6).

4

begins with three paragraphs explaining that Facebook has banned several individuals from its platform. Ex. 7 at 1-2. It then quotes a statement by a Facebook spokesperson regarding the account removals:

> "We've always banned individuals or organizations that promote or engage in violence and hate, regardless of ideology," a Facebook spokesperson said in a statement provided to CNN Business. "The process for evaluating potential violators is extensive and it is what led us to our decision to remove these accounts today."

*Id.* at 2. Ms. Loomer alleges that this quotation explains Facebook's "justification behind Ms. Loomer's ban." Am. Compl. ¶ 6. The CNN Article also states:

> A Facebook spokesperson told CNN Business the company goes through a lengthy process and takes into consideration a number of factors before determining an individual to be "dangerous."
>
> The Facebook spokesperson said such factors include whether the person or organization has ever called for violence against individuals based on race, ethnicity, or national origin; whether the person has been identified with a hateful ideology; whether they use hate speech or slurs in their about section on their social media profiles; and whether they have had pages or groups removed from Facebook for violating hate speech rules.

*See id.* ¶¶ 7-8; *see also* Ex. 7 at 2-3.

Numerous other news outlets also reported on the story, including by reporting examples provided by Facebook for deactivating the accounts of each individual. For Ms. Loomer, Facebook told news organizations that she had appeared with Gavin McInnes, the leader of the far-right "Western chauvinist" organization called the "Proud Boys," and expressed support for Faith Goldy, a far-right political activist who has espoused theories of "white genocide"—both of whom were previously banned from Facebook pursuant to the DIO policy.[8]

---

[8] *See, e.g.*, Casey Newton, *Facebook bans Alex Jones and Laura Loomer for violating its policies against dangerous individuals*, The Verge (May 2, 2019), available at https://www.theverge.com/2019/5/2/18526964/facebook-ban-alex-jones-laura-loomer-milo-louis-farrakhan (Ex. 8); Dave Lee, *Facebooks bans 'dangerous individuals'*, BBC (May 3, 2019), available at https://www.bbc.com/news/technology-48142098 (Ex. 9); Elizabeth Dwoskin and Craig Timberg,

On June 30, 2019, Facebook published a second installment of its Civil Rights Audit Progress Report. The Audit also describes Facebook's decision to deactivate the accounts of Ms. Loomer and others in May 2019:

> In recent months, Facebook has continued to apply its "Dangerous Individuals and Organizations" policy, which bans organizations or individuals from the platform when they meet certain hate or violence criteria. *Under that policy, individuals or organizations that amplify or traffic in hate are banned from the platform, as was the case with Facebook's recent bans of Alex Jones, Milo Yiannopolous, Laura Loomer, Minister Louis Farrakhan and others.*

Am. Compl. ¶ 27 (emphasis added). *See also* Ex. 1.

Ms. Loomer is no stranger to controversy. She has made news, for example, by:

- calling the national media "ISIS" while interrupting a performance of Shakespeare's *Julius Caesar* in New York's Central Park;
- calling for "a non Islamic form of [U]ber or [L]yft because I never want to support another Islamic immigrant driver";
- protesting Speaker of the House of Representatives Nancy Pelosi's stance on immigration by setting up a "sanctuary" tent on Pelosi's property in northern California;
- along with her associates, protesting California Governor Gavin Newsom's immigration policies at the Governor's Mansion in Sacramento, California while wearing sombreros, serapes, and fake moustaches; and
- posting an Instagram video in which she said "Islam is a cancer on society. Islam is a cancer on humanity, and Muslims should not be allowed to seek positions of political office in this country. It should be illegal."[9]

---

*Facebook bans extremist leaders including Louis Farrakhan, Alex Jones and Milo Yiannopolous for being 'dangerous'*, Wash. Post (May 2, 2019), available at https://www.washingtonpost.com/technology/2019/05/02/facebook-bans-extremist-leaders-including-louis-farrakhan-alex-jones-milo-yiannopoulos-being-dangerous/ (Ex. 10); Queenie Wong, *Facebook and Instagram ban Alex Jones, Milo Yiannopoulos, other far-right figures*, CNET (May 3, 2019), available at https://www.cnet.com/news/facebook-and-instagram-ban-alex-jones-milo-yiannopoulos-and-other-far-right-leaders/ (Ex. 11).

[9] *See, e.g.*, Andrew Marantz, *Behind the Scenes with the Right Wing Activist who Crashed "Julius Caesar"*, The New Yorker (June 20, 2017), available at https://www.newyorker.com/news/news-desk/behind-the-scenes-with-the-right-wing-activist-who-crashed-julius-caesar-laura-loomer (Ex. 12); Tom McKay, *Far Right Twitter Personality Laura Loomer Banned From Uber, Lyft for Racist Tweets*, Gizmodo (Nov. 1, 2017), available at https://gizmodo.com/far-right-twitter-personality-laura-loomer-banned-from-1820062169 (Ex. 13); Benny Johnson, *Activists Jump California Governor's Mansion Wall in Sombreros, Ponchos — Get Arrested*, Daily Caller

Ms. Loomer is also running for Congress in Florida. Am. Compl. ¶ 23.

Ms. Loomer filed the operative complaint on August 5, 2019, asserting claims for defamation, defamation per se, and defamation by implication. *See generally id.* In providing the basis for each claim, she identifies two statements: (1) Facebook's designation of her as "a dangerous individual" as the basis for removing her Facebook accounts, *id.* ¶ 30; and (2) the alleged implication—based on the CNN Article—that Facebook removed her accounts because she had "promote[d] or engage[d] in violence and hate," *id.* ¶ 29. Elsewhere in the Amended Complaint, she points to statements she attributes to Facebook even though she does not allege Facebook ever uttered them. Specifically, she alleges that a quote by a Democratic Congressional Campaign Committee spokesperson referring to Ms. Loomer as a "white nationalist" in a *Miami Herald* article about her Congressional campaign "obviously was generated by and emanates from Defendant Facebook," *id.* ¶ 23, and that Facebook has led others "to believe that she is dangerous and a domestic terrorist against Muslims in particular," *id.* ¶ 32. *See also id.* ¶ 45 (alleging Facebook implied that Ms. Loomer is a "domestic Jewish female terrorist"). Ms. Loomer seeks more than $3 billion in damages. *See id.* at 10. Along with this motion, Facebook has filed a motion to transfer this case to the Northern District of California.

---

(Jan. 30, 2019), available at https://dailycaller.com/2019/01/30/activists-jump-ca-governors-mansion-wall (Ex. 14); Joe Tacopino, *Far-right activist sets up 'caravan sanctuary' on Nancy Pelosi's lawn*, New York Post (Jan. 14, 2019), available at https://nypost.com/2019/01/14/far-right-activist-sets-up-caravan-sanctuary-on-nancy-pelosis-lawn/ (Ex. 15); Natalie Martinez, *In the past 24 hours, Alex Jones and Laura Loomer have taken to Instagram to promote white nationalism*, Media Matters (Apr. 11, 2019), available at https://www.mediamatters.org/alex-jones/past-24-hours-alex-jones-and-laura-loomer-have-taken-instagram-promote-white-nationalism (Ex. 16).

### III.     ARGUMENT

Under Rule 12(b)(6), a plaintiff must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While the Court must accept well-pleaded factual allegations as true, it need not accept "[l]egal conclusions without adequate factual support." *Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011). These "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Further, in deciding such a motion, the Court may consider documents on which the complaint relies and documents subject to judicial notice—here, the DIO policy, Ms. Loomer's website, and the news articles described in Section II. *Supra* at 3 n.2. Deciding whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Where, as here, a plaintiff has not "not nudged [her] claims across the line from conceivable to plausible," the complaint "must be dismissed." *Twombly*, 550 U.S. at 570.

Ms. Loomer has failed to state claims for defamation, defamation per se, or defamation by implication. Such claims require her to allege a defamatory statement is false, unprivileged, was made with the requisite level of fault, and caused damage. *See* Cal. Civ. Code §§ 44-46 (California law); *Turner*, 879 F.3d at 1262 (Florida law).[10] Because Ms. Loomer has failed to plausibly allege

---

[10] Facebook bases its arguments on First Amendment principles. Should a choice-of-law analysis become necessary, California law applies. Facebook's Terms of Service—to which Loomer agreed—state that California law governs any "claim, cause of action, or dispute" a user has "that arises out of or relates to these Terms or the Facebook Products." *See* Transfer Mot. at 3. Moreover, California has the "most significant relationship" to this case, as Facebook decided to deactivate Ms. Loomer's account there. *See Michel v. NYP Holdings, Inc.*, No. 14-62649-CIV, 2015 WL 1285309, at *3 (S.D. Fla. Mar. 4, 2015) (applying New York law to claim by Florida plaintiff where New York-based defendant "researched and wrote" the allegedly defamatory statements in New York), *aff'd in relevant part*, 816 F.3d 686 (11th Cir. 2016). In any event, the elements of defamation relevant to this motion are substantially similar under both California and

8

any false and defamatory statements, or that Facebook acted with actual malice (the applicable standard of fault), the Court should dismiss her complaint. Further, to the extent Ms. Loomer challenges Facebook's decision to disable her account, the First Amendment also bars her claim.

### A. Ms. Loomer Fails to Allege Any False and Defamatory Statements.

Under the First Amendment, "there can be no false ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974). Accordingly, "statements that are not readily capable of being proven false and statements of pure opinion are protected from defamation actions." *Turner*, 879 F.3d at 1262-63; *see also Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 717 (11th Cir. 1985) ("Opinions are protected from defamation actions by the first amendment."); *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995) (First Amendment shields "statements of opinion on matters of public concern that do not contain or imply a provable factual assertion"). This is because "[h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz*, 418 U.S. at 339-40. "Whether the statement is one of fact or opinion [is a] question[] of law for the court." *Turner*, 879 F.3d at 1262-63; *see also Rodriguez v. Panayiotou*, 314 F.3d 979, 985-86 (9th Cir. 2002) ("[W]hether an allegedly defamatory statement constitutes fact or opinion is a question of law for the court to decide.").

Applying this principle, courts have long held that assertions of bigotry, racism, prejudice, and political extremism are in the eye of the beholder, and therefore constitute subjective opinion that cannot be the basis for a defamation claim. *See, e.g.*, *Buckley v. Littell*, 539 F.2d 882, 893-95 (2d Cir. 1976) (description of plaintiff as a "fellow traveler" of "fascist[s]" and the "radical right"

---

Florida law. *Compare Turner*, 879 F.3d at 1262 (Florida law), *with* Cal. Civ. Code §§ 44-46 (California law).

9

could not "be regarded as having been proved to be statements of fact . . . because of the tremendous imprecision of the meaning and usage of these terms in the realm of political debate"); *Standing Comm. on Discipline v. Yagman*, 55 F.3d 1430, 1440 (9th Cir. 1995) (describing judge as "anti-Semitic" was non-actionable opinion); *Forte v. Jones*, No. 11-cv-0718, 2013 WL 1164929, at *6 (E.D. Cal. Mar. 20, 2013) ("[T]he allegation that a person is a 'racist'. . . is not actionable because the term 'racist' has no factually-verifiable meaning."); *Stevens v. Tillman*, 855 F.2d 394, 402 (7th Cir. 1988) (allegation that plaintiff was a "racist" was not actionable).[11]

Accusations that a plaintiff is "dangerous" are similarly non-actionable. *See Del Fuoco v. O'Neill*, No. 8:09-CV-1262, 2011 WL 601645, at *5–6 (M.D. Fla. Feb. 11, 2011) (granting motion to dismiss and finding that statement that the plaintiff was "bizarre and dangerous" was protected opinion); *Stevens v. Mavent, Inc.*, No. SA CV 07-245, 2008 WL 2824956, at *7 (C.D. Cal. July 21, 2008) (statement that plaintiff was "dangerous" was protected opinion as a matter of law); *Montgomery v. Risen*, 875 F.3d 709, 714 (D.C. Cir. 2017) (characterization of plaintiff's software

---

[11] *See also, e.g. Edelman v. Croonquist*, No. 09-CV-1938, 2010 WL 1816180, at *6 (D.N.J. May 4, 2010) ("The . . . characterization of [plaintiffs] as racists is a subjective assertion, not sufficiently susceptible to being proved true or false to constitute defamation."); *Squitieri v. Piedmont Airlines, Inc.*, No. 3:17CV441, 2018 WL 934829, at *4 (W.D.N.C. Feb. 16, 2018) ("Statements indicating that Plaintiff is racist are clearly expressions of opinion that cannot be proven as verifiably true or false."); *Smith v. Sch. Dist. of Phila.*, 112 F. Supp. 2d 417, 429 (E.D. Pa. 2000) (accusation that plaintiff was "racist and anti-Semitic" was not actionable because it was "merely non-fact based rhetoric"); *Jackson v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, No. 2:07-cv-461, 2009 WL 10704261, at *39 (N.D. Ala. Feb. 23, 2009) (statement that plaintiff "was a 'racist' and a 'radical'" non-actionable); *Raible v. Newsweek, Inc.*, 341 F. Supp. 804, 807 (W.D. Pa. 1972) ("We hold that to call a person a bigot or other appropriate name descriptive of his political, racial, religious, economic or sociological philosophies gives no rise to an action for libel."); *McCaskill v. Gallaudet Univ.*, 36 F. Supp. 3d 145, 159 (D.D.C. 2014) (statement that plaintiff was "anti-gay" was non-actionable); *Ward v. Zelikovsky*, 643 A.2d 972, 983 (N.J. 1994) (accusation that plaintiffs "hate[d] . . . Jews" non-actionable); *Condit v. Clermont Cty. Rev.*, 675 N.E.2d 475, 478 (Ohio Ct. App. 1996) ("Numerous courts have concluded that allegations of fascism, anti-Semitism, or other accusations of ethnic bigotry are not actionable as defamation.") (collecting cases).

as an "elaborate and dangerous hoax[]" was protected opinion as a matter of law). Such terms are "so debatable, loose and varying" in meaning that they are "insusceptible to proof of truth or falsity." *Buckley*, 539 F.2d at 894; *see also Farah v. Esquire Magazine, Inc.*, 736 F.3d 528, 534-35 (D.C. Cir. 2013) (affirming dismissal and noting that, "[w]here a statement is so imprecise or subjective that it is not capable of being proved true or false, it is not actionable in defamation.").

So too here. The phrases "dangerous" and "promotes hate" are "so debatable, loose and varying" in meaning that they are "insusceptible to proof of truth or falsity." *Buckley*, 539 F.2d 882, at 895. Ms. Loomer is, by her own admission, a controversial figure. She has called Islam a "cancer on society" and "cancer on humanity" and advocated for laws prohibiting Muslims from serving in public office. Ex. 16. She has advocated a "non Islamic form of [U]ber or [L]yft" so she doesn't have to "support another Islamic immigrant driver." Ex. 13. And she has appeared with or expressed support for individuals widely regarded as advocating or being associated with white nationalism. Exs. 8, 9. While Ms. Loomer may not believe she is "dangerous" or has "promoted hate," others disagree—as demonstrated by her admission that she has been widely banned from social media platforms and other online services. Ex. 5. Where "different constituencies can hold different—and completely plausible—views of Plaintiff's actions, statements characterizing those actions constitute protected opinion." *McCaskill*, 36 F. Supp. 3d at 159 (reference to plaintiff as "anti-gay" was non-actionable opinion). The opinions Facebook allegedly expressed are more than plausible. *See also, e.g., Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798, 810 (2002) (there can be no liability for "statements of the speaker's subjective judgment"); *Ctr. for Immigration Studies v. Cohen*, No. CV 19-0087, 2019 WL 4394838, at *4 (D.D.C. Sept. 13, 2019) (Southern Poverty Law Center's designation of plaintiff as a "hate group"

11

does not constitute a false statement of "fact," since "whether or not SPLC adhered to its definition to designate [plaintiff] to be a hate group is an entirely subjective inquiry").

This doctrine applies with special force where, as here, the speaker outlines the basis for its opinion. Ms. Loomer admits Facebook explained it considers several factors in deciding whether someone has violated its DIO policy, including "whether the person has been identified with a hateful ideology" and "whether they have had pages or groups removed from Facebook for violating hate speech rules." Am. Compl. ¶ 8. Ms. Loomer does not claim that no one has associated her with hateful ideology, and admits that Facebook had previously suspended her account for 30 days. *Id.* ¶¶ 12-13. Under both California and Florida law, a statement constitutes protected opinion when it is based on disclosed facts, which are not themselves actionable. *See Gardner v. Martino*, 563 F.3d 981, 987 (9th Cir. 2009) ("[W]hen a speaker outlines the factual basis for his conclusion, his statement is not defamatory and receives First Amendment protection."); *Turner*, 879 F.3d at 1262-63 (statement that coach engaged in "homophobic taunting" protected where it was based on facts that other players taunted plaintiff, coach knew about it, and coach gave plaintiff a male blow-up doll).

Nor can Ms. Loomer cherry-pick phrases from the broader DIO policy to claim that Facebook implied she "promotes violence" or is a "white nationalist" or a "domestic terrorist"— the latter two of which she does not even allege Facebook actually uttered. *See* Am. Compl. ¶¶ 23, 32. A plaintiff alleging defamation by implication must show not only that the alleged implication was "reasonable," but also that the speaker "intended to convey the defamatory implication." *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1064 (9th Cir. 1998). No reasonable

12

reader could take from the CNN article or DIO policy that Facebook implied these facts.[12]

The statement concerning violence—that Facebook has "always banned individuals or organizations that promote or engage in violence"—concerns Facebook's historical practices, not, as Ms. Loomer claims, the specific "justification" for banning her. Am. Compl. ¶ 6. To the contrary, the factors identified in the CNN Article all relate to the DIO policy's prohibition against individuals and organizations affiliated with "organized hate," and the Civil Rights Audit confirms that her account and others were removed for violating the DIO policy by "amplify[ing] or traffic[king] in hate." *Id.* ¶ 27. Similarly, Ms. Loomer identifies no Facebook statement from which one could plausibly conclude she is a "terrorist." That the DIO policy *also* prohibits accounts associated with terrorism is irrelevant, as it does not purport to forbid *only* terrorism. *Id.* ¶ 9; *see also* Ex. 4. This Court should not find, as Ms. Loomer urges, "a defamatory meaning which [Facebook's statements] do[] not convey to a lay reader." *Forsher v. Bugliosi*, 26 Cal. 3d 792, 803 (1980) (rejecting claim that a book defamed the plaintiff by repeatedly connecting him with events related to a murder); *see also, e.g.*, *Rubin v. U.S. News & World Report, Inc.*, 271 F.3d 1305 (11th Cir. 2001) (article discussing illegal practices found in the international gold trade did not state or imply that plaintiff, a gold refiner who was quoted in the article, engaged in such practices); *Bartholomew v. YouTube, LLC.*, 17 Cal. App. 5th 1217, 1229 (2017) (linking to explanation of types of content that will be removed from website did not state that plaintiff had committed each and every one of those offenses).

---

[12] Indeed, Ms. Loomer's claim based on the quote in the *Miami Herald* (Am. Compl. ¶ 23) does not even satisfy the first element of a defamation claim, *i.e.*, it must be a statement by the defendant. *See, e.g.*, *Five for Entm't S.A. v. Rodriguez*, No. 11-24142-CIV, 2013 WL 4433420, at *6 (S.D. Fla. Aug. 15, 2013). Ms. Loomer does not claim Facebook called her a "white nationalist," and she alleges no facts to support her conclusion that term "emanate[d]" from Facebook, much less that it "obviously" did so. Am. Compl. ¶ 23.

### B. Ms. Loomer Fails to Plead that Facebook Acted with Actual Malice.

Even if the Court could conclude that the reference to Ms. Loomer as "dangerous" or "promot[ing] or engag[ing] in … hate" states provably false facts, and even if Facebook made the statements she alleges it did, the Amended Complaint would *still* fail as a matter of law because it does not and cannot plausibly allege the requisite level of fault.

Under the First Amendment, a public figure "may recover for injury to reputation only on clear and convincing proof of 'actual malice,'" a state of mind defined as "knowledge of . . . fals[ity] or . . . reckless disregard of whether it was false or not." *Gertz*, 418 U.S. at 342 (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)); *see also Michel*, 816 F.3d at 702; *Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 891 (9th Cir. 2016). Ms. Loomer essentially concedes she is a public figure. She alleges she "is a well-known conservative investigative journalist" and "a conservative Jewish female activist." Am. Compl. ¶¶ 1-2 (at 2). Indeed, Ms. Loomer does not even bother to allege Facebook acted with negligence (the standard for a private figure); instead, she pleads only a bare-bones recitation of the actual malice standard, thereby tacitly admitting her public-figure status. *Id.* ¶¶ 31, 38, 44. Moreover, she has garnered extensive media coverage for her extreme views and political stunts, and describes herself as the "most banned woman in the world."[13] Accordingly, this Court can and should hold that Ms. Loomer is a public figure. *See, e.g.*, *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 88 (D.D.C. 2018) (self-described "political activist and a grassroots journalist who uses social media to reach the public" qualified as a public figure); *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1190 (9th Cir. 1989) ("prominent and outspoken feminist author and activist" was a public figure).

Because the Amended Complaint concedes Ms. Loomer is a public figure, she must show

---

[13] *See supra* at 6; *see also* Ex. 5.

14

Facebook acted with actual malice. "The standard of actual malice is a daunting one." *Howard v. Antilla*, 294 F.3d 244, 252 (1st Cir. 2002) (quoting *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996)). A plaintiff must allege facts sufficient to give rise to a reasonable inference that the false statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times*, 376 U.S. at 279-80. The test is not an objective one. *See St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Rather, courts ask "whether the defendant, instead of acting in good faith, actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false." *Michel*, 816 F.3d at 702-03.[14]

"[A]fter *Iqbal* and *Twombly*, every circuit that has considered the matter has applied the *Iqbal/Twombly* standard and held that a defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice." *Michel*, 816 F.3d at 702 (affirming dismissal on this basis). Dismissal for failure to plausibly plead actual malice "makes particular sense" in public-figure suits like this one, where "there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation." *Id.* Accordingly, courts routinely dismiss such claims under Rule 12(b)(6) where, as here, the plaintiff merely recites the legal standard. *See, e.g.*, *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012); *Biro v. Condé Nast*, 807 F.3d 541, 546 (2d Cir. 2015); *Mayfield v. NASCAR, Inc.*, 674 F.3d 369,

---

[14] The Supreme Court has decided that this showing can be inferred where, for example, "a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call," or where the "publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation." *St. Amant*, 390 U.S. at 732. Additionally, "the failure to investigate, standing alone, does not give rise to a conclusion that the defendants acted with actual malice[; r]ather, the plaintiff must plead facts giving rise to a reasonable inference that the defendants acted to intentionally avoid learning the truth." *Michel*, 816 F.3d at 704.

15

378 (4th Cir. 2012); *Arpaio v. Cottle*, No. 18-cv-02387, 2019 WL 3767104, at *4 (D.D.C. Aug. 9, 2019) (dismissing claim where plaintiff "[did] no more than recite the applicable legal standard" and offer "unadorned claim[s] of animus and bias," which "come nowhere close" to plausibly pleading actual malice); *Fairbanks*, 314 F. Supp. 3d at 92 (dismissing complaint where plaintiff alleged that defendant knew her statement was false, failed to follow "professional standards of journalism," and had a "motive to smear" plaintiff).

Ms. Loomer's actual malice allegations are conclusory and insufficient. Ms. Loomer claims, for example, that Facebook's "statements were published with malice, as Defendant Facebook knew that they were false and misleading, or at a minimum acted and published with a reckless disregard for the truth." Am. Compl. ¶ 31. She alleges Facebook "knew that Ms. Loomer had never once promoted or engaged in violence and hate, and that Ms. Loomer was not a 'dangerous' individual." *Id.* ¶ 19. These allegations do not pass muster under *Iqbal* and *Twombly*: They "amount to little more than '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements,' which are insufficient to support a cause of action." *Michel*, 816 F.3d at 704 (quoting *Iqbal*, 556 U.S. at 678) (disregarding allegations that defendants were "reckless" in publishing article). On this basis alone, the Court should dismiss the Amended Complaint.

Nor can Ms. Loomer cure this deficiency by amendment. Given Ms. Loomer's widely reported controversial statements and actions and her admission that numerous other companies have banned her for this and similar behavior, Facebook's decision to deactivate her accounts for violating its policies is, at a minimum, "one of a number of possible rational interpretations" of her actions and public statements. *Pape*, 401 U.S. at 290. Where a statement is open to multiple interpretations, a defendant cannot be liable if it believed *its* interpretation to be true. *See CACI*

16

*Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 296 (4th Cir. 2008) (no actual malice where defendant adopted one of at least two "rational interpretations" of underlying facts). Ms. Loomer's disagreement with Facebook's decision does not make it false, nor can she plausibly allege that Facebook *knew* that she was not "dangerous" or "promoting hate" when it determined that she violated its policies. Accordingly, the Court should dismiss her suit with prejudice.

### C. The First Amendment Protects Facebook's Decision to Disable Ms. Loomer's Accounts. [15]

At bottom, Ms. Loomer's lawsuit reflects her disagreement with Facebook's decision to disable her accounts. Ms. Loomer alleges that "[i]n issuing the ban against Ms. Loomer," Facebook "publicly designated her as 'dangerous.'" Am. Compl. ¶ 7; *see also, e.g.*, *id.* ¶ 24 ("The *Miami Herald* article even cites the fact that Plaintiff Loomer was banned from Defendant Facebook. Defendant Facebook is therefore, in effect, re-libeling her."). Tellingly, she alleges no harm stemming from Facebook's statements, as distinct from its decision to ban her. To the extent Ms. Loomer targets Facebook's editorial decisions, her claims fail.

The First Amendment protects Facebook's decision to disable Ms. Loomer's accounts. "[O]nline publishers have a First Amendment right to distribute others' speech and exercise editorial control on their platforms." *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991-22 (S.D. Tex. 2017); *see also, e.g., Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 438-39 (S.D.N.Y. 2014) (when online platforms "select and arrange others' materials, and add the all-important ordering that causes some materials to be displayed first and others last, they are

---

[15] Section 230 of the Communications Decency Act, 47 U.S.C. § 230, also protects Facebook's decision. With limited exceptions not relevant here, Section 230(c) prohibits all civil claims against an online publisher such as Facebook based on its decisions to publish or remove third-party content. *See Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006); *see also*, *e.g.*, *Am. Income Life Ins. Co. v. Google, Inc.*, No. 2:11-CV-4126, 2014 WL 4452679, at *6 (N.D. Ala. Sept. 8, 2014).

engaging in fully protected First Amendment expression"). For example, in *e-ventures Worldwide, LLC v. Google, Inc.*, No. 2:14-cv-646, 2017 WL 2210029, at *4 (M.D. Fla. Feb. 8, 2017), the court dismissed a claim premised on Google's removal of the plaintiff's websites from search engine results because the plaintiff had allegedly violated Google's policies. The court held that the First Amendment "protects these decisions, whether they are fair or unfair, or motivated by profit or altruism." *Id.* Accordingly, in Ms. Loomer's prior lawsuit against Facebook, the court held that "selective censorship" "is not actionable under the First Amendment unless perpetrated by a state actor." *Freedom Watch, Inc.*, 368 F. Supp. 3d at 41. The same is true here.

## IV. CONCLUSION

For these reasons, Facebook respectfully asks the Court to grant this motion and dismiss the case with prejudice under Federal Rule of Civil Procedure 12(b)(6).

## REQUEST FOR A HEARING

In accordance with Local Rule 7.1(b)(2), Facebook requests a hearing focused on the legal issues raised by this motion.

Dated: September 16, 2019

            s/Brian W. Toth
            GELBER SCHACHTER & GREENBERG, P.A.
            Brian W. Toth
            Florida Bar No. 57708
            Natalia B. McGinn
            Florida Bar No. 1011385
            1221 Brickell Avenue, Suite 2010
            Miami, Florida 33131
            Phone: (305) 728-0965
            btoth@gsgpa.com
            nmcginn@gsgpa.com

            DAVIS WRIGHT TREMAINE LLP

Laura R. Handman*
Alison Schary*
Chelsea T. Kelly*
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC 20006
Phone: (202) 973-4224
laurahandman@dwt.com
alisonschary@dwt.com
chelseakelly@dwt.com

*Admitted pro hac vice*

*Counsel for Defendant Facebook, Inc.*