**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

LAURA LOOMER,

    *Plaintiff*,

v.

FACEBOOK, INC.,

    *Defendant*.

Case No. 9:19-cv-80893-RS

## DEFENDANT FACEBOOK, INC.'S MOTION FOR SUMMARY JUDGMENT

GELBER SCHACHTER & GREENBERG
Brian W. Toth
Natalia B. McGinn
1221 Brickell Avenue
Suite 2010
Miami, Florida 33131
Phone: (305) 728-0965
Fax: (305) 728-0951
btoth@gsgpa.com
nmcginn@gsgpa.com

DAVIS WRIGHT TREMAINE LLP
Laura R. Handman*
Alison Schary*
Chelsea T. Kelly*
Suite 800
1919 Pennsylvania Avenue, N.W.
Washington, DC 20006
Phone: (202) 973-4224
Fax: (202) 973-4450
laurahandman@dwt.com
alisonschary@dwt.com
chelseakelly@dwt.com

*Counsel for Defendant Facebook, Inc.*
*Admitted pro hac vice

I. INTRODUCTION

Plaintiff Laura Loomer claims that Facebook defamed her by removing her accounts and explaining that she had violated its Dangerous Individuals and Organizations ("DIO") policy. As Facebook argued in its pending Rule 12(b)(6) motion, Ms. Loomer has not even stated a claim as a matter of law. Now, having failed to conduct *any* discovery, Ms. Loomer cannot create a genuine issue of material fact to survive Facebook's motion for summary judgment on all of her claims. Ms. Loomer's claims were (and remain) prime for dismissal.

*First*, Ms. Loomer has not identified any false or defamatory statements of fact made by Facebook. To the extent she alleges Facebook called her "dangerous" by removing her accounts pursuant to its DIO policy and describing its policy generally in the press, the law is clear that calling someone "dangerous"—or saying that she "promoted" or "engaged" in "hate"—is a protected statement of opinion. Even if it were not, Ms. Loomer cannot possibly meet her burden to prove that it would be objectively false to describe her as "dangerous" or promoting or engaging in "hate" given her widely reported controversial public statements. To the extent Ms. Loomer is claiming, in the guise of a claim for "defamation by implication," that Facebook branded her a "terrorist" or accused her of conduct that would *also* violate the DIO policy, Ms. Loomer offers no basis to suggest (as she must) that Facebook ever intended or endorsed that implication.

*Second*, Ms. Loomer is undisputedly a public figure and cannot meet her heavy burden to demonstrate by "clear and convincing evidence" that Facebook acted with actual malice. At this stage, Ms. Loomer can no longer rely on the threadbare allegations in her complaint. Having failed to conduct discovery, there is no record evidence to suggest that Facebook subjectively knew she was *not* "dangerous" and/or did *not* "promote … hate." Nor could she ever make this showing: given Ms. Loomer's public statements and actions, and the fact that most major platforms have

banned her for violating their policies, this is clearly an issue where, at a minimum, reasonable minds can disagree. *See Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971).

*Finally*, Ms. Loomer's claims are, at their core, targeting Facebook's decision to remove her accounts from its platform for violation of its community standards and policies. Both the Communications Decency Act and the First Amendment provide absolute protection for Facebook's decision and therefore independently bar her claims.

For all of these reasons, the Court should grant Facebook's motion for summary judgment and dismiss Ms. Loomer's claims with prejudice.[1]

## II.     BACKGROUND

### A.     Factual Background

Facebook is the world's largest social media platform, with more than 2 billion users. To maintain a safe environment, Facebook requires its users to comply with the Community Standards published on its platform, including the DIO policy. Statement of Material Facts ("SMF") ¶ 9. The DIO policy bars from Facebook organizations or individuals involved in "[o]rganized hate." *Id.* ¶ 10; Declaration of Nicholas Wong ("Wong Decl.") Ex. 1 at 1. The policy defines a "hate organization" as "[a]ny association of three or more people that is organized under a name, sign, or symbol and that has an ideology, statements, or physical actions that attack individuals based on characteristics, including race, religious affiliation, nationality, ethnicity, gender, sex, sexual orientation, serious disease or disability." SMF ¶ 10; Wong Decl., Ex. 1 at 2. The policy also states that Facebook does not permit "content that praises" or "coordination of support for" "any

---

[1] Facebook has also filed a motion to transfer this case to the Northern District of California, based on a forum-selection clause to which Ms. Loomer agreed. ECF No. 24. That motion remains pending. Should the Court grant its motion to transfer, Facebook reserves the right to file a motion to strike pursuant to the California Anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16, upon transfer to the Northern District of California.

2

of the above organizations or individuals or any acts committed by them." SMF ¶ 12; Wong Decl., Ex. 1 at 3. In addition to organized hate, the policy also does "not allow any organizations or individuals . . . involved in . . . Terrorist activity[,] . . . Mass or serial murder[,] Human trafficking[, or] Organized violence or criminal activity" to have a presence on Facebook. SMF ¶ 11; Wong Decl., Ex. 1 at 1.

Ms. Loomer is a self-described "well-known conservative investigative journalist" and "conservative Jewish female activist," who is currently running for Congress in Florida. SMF ¶¶ 2–3. On her website, she describes herself as a "Guerrilla-style" journalist who "often conducts ambush interviews on live stream," a tactic she calls getting "Loomered." *Id.* ¶ 4; Ex. 1 at 1. Ms. Loomer often posts these videos to her website, as well as short articles about her political actions and topics such as "Islam in America." SMF ¶ 5; Ex. 2.

Ms. Loomer is no stranger to controversy. She has made news, for example, by:

- posting an Instagram video in which she said "Islam is a cancer on society. Islam is a cancer on humanity, and Muslims should not be allowed to seek positions of political office in this country. It should be illegal";

- describing herself with the hashtag "#ProudIslamaphobe" after stating "let me be the first to say I never want another Muslim entering this country EVER AGAIN!" and calling Muslims "savages" on Twitter;

- calling the national media "ISIS" while interrupting a performance of Shakespeare's Julius Caesar in New York's Central Park;

- posting a series of anti-Muslim tweets following a terrorist attack in New York City, including calling for "a non Islamic form of [U]ber or [L]yft because I never want to support another Islamic immigrant driver," which resulted in her being banned by both Uber and Lyft;

- protesting Speaker of the House of Representatives Nancy Pelosi's stance on immigration by setting up a "sanctuary" tent on Pelosi's property in Northern California;

- along with her associates, protesting California Governor Gavin Newsom's immigration policies at the Governor's Mansion in Sacramento, California, while wearing sombreros, serapes, and fake moustaches.

3

SMF ¶ 6; Exs. 3-12.

As a result of these and similar behaviors, multiple technology platforms have banned Ms. Loomer for violating their Terms of Service. In late 2018, Twitter banned Ms. Loomer for posting a tweet claiming Congresswoman Ilhan Omar was "anti Jewish." SMF ¶ 7. On her website, Ms. Loomer calls herself the "most banned woman in the world," stating that she has been banned by Twitter, PayPal, Periscope, Lyft, GoFundMe, Venmo, Medium, TeeSpring, Uber, and Uber Eats. *Id.* ¶ 8; Ex. 14 at 3-4; Ex. 15 at 10-20.

On May 2, 2019, Facebook removed Ms. Loomer's accounts from its platform, along with the accounts of Milo Yiannopoulos, Paul Joseph Watson, Paul Nehlen, Alex Jones, Louis Farrakhan, and InfoWars. SMF ¶ 13. Facebook's decision drew widespread media coverage, including a CNN article with the headline "Louis Farrakhan, Alex Jones and Other 'Dangerous' Voices Banned by Facebook and Instagram" (the "CNN Article"). *Id.* ¶ 15; Ex. 16. The CNN Article begins with three paragraphs explaining that Facebook has banned several individuals from its platform. Ex. 16 at 1-2. It then quotes a statement by a Facebook spokesperson regarding the account removals:

> "We've always banned individuals or organizations that promote or engage in violence and hate, regardless of ideology," a Facebook spokesperson said in a statement provided to CNN Business. "The process for evaluating potential violators is extensive and it is what led us to our decision to remove these accounts today."

*Id*. at 2. The CNN Article also states:

> A Facebook spokesperson told CNN Business the company goes through a lengthy process and takes into consideration a number of factors before determining an individual to be "dangerous."
>
> The Facebook spokesperson said such factors include whether the person or organization has ever called for violence against individuals based on race, ethnicity, or national origin; whether the person has been identified with a hateful ideology; whether they use hate speech or slurs in their about section on their social

4

>media profiles; and whether they have had pages or groups removed from Facebook for violating hate speech rules.

*Id.* at 2-3.

Numerous other news outlets also reported on the story, including by reporting examples provided by Facebook for deactivating the accounts of each individual. For Ms. Loomer, Facebook identified the fact that she had appeared with Gavin McInnes and expressed support for Faith Goldy—both of whom were previously banned from Facebook pursuant to the DIO policy—as examples of Ms. Loomer's conduct contributing to her removal under the DIO Policy. SMF ¶ 18.

On June 30, 2019, Facebook published a second installment of its Civil Rights Audit Progress Report online. The Audit reiterates that the accounts of Ms. Loomer and the other individuals were removed pursuant to the DIO policy for "amplify[ing] or traffic[king] in hate." *Id.* ¶ 19; *see also* Wong Decl., Ex. 2 at 10.

### B.   Procedural History

Ms. Loomer filed the operative complaint in this Court on August 5, 2019, asserting claims for defamation, defamation *per se*, and defamation by implication. *See generally* Am. Compl. (ECF No. 7). In providing the grounds for each claim, she identifies two statements: (1) Facebook's designation of her as "a dangerous individual" as the basis for removing her Facebook accounts, *id.* ¶ 30; and (2) the alleged implication—based on the CNN Article—that Facebook removed her accounts because she had "promoted or engaged in violence and hate," *id.* ¶ 29. Elsewhere in the Amended Complaint, she points to statements she attributes to Facebook even though she does not allege Facebook ever uttered them. Specifically, she alleges that a quote by a Democratic Congressional Campaign Committee spokesperson referring to Ms. Loomer as a "white nationalist" in a *Miami Herald* article about her Congressional campaign "obviously was

5

generated by and emanates from Defendant Facebook," *id.* ¶ 23, and that Facebook has led others "to believe that she is dangerous and a domestic terrorist against Muslims in particular," *id.* ¶ 32. *See also id.* ¶ 45 (alleging Facebook implied that Ms. Loomer is a "domestic Jewish female terrorist").

On September 16, 2019, Facebook filed a motion to dismiss under Rule 12(b)(6) and a motion under 28 U.S.C. § 1404(a) to transfer the case to the U.S. District Court for the Northern District of California, both of which remain pending before the Court. *See* ECF Nos. 24, 25. Ms. Loomer failed to serve any discovery requests or take any depositions during the time period set forth in the Court's Scheduling Order. She sought and was denied an extension, after which she immediately filed a nearly identical complaint in Florida state court. *See* ECF No. 52-1. Facebook removed the state court case, and Ms. Loomer has filed a motion to remand. *See Loomer v. Facebook, Inc.*, Case No. 9:20-cv-80484-RS (S.D. Fla. 2020) (hereinafter, "*Loomer II*").

### III. ARGUMENT

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

At this stage, it is insufficient for Ms. Loomer to rest on the "mere allegations" of her complaint; instead, she "must present affirmative evidence" sufficient to demonstrate a "genuine issue for trial." *Id.* at 256-57. "This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct

6

discovery." *Id.* at 257. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1162 (11th Cir. 2006) (citation omitted); *see also Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000) (same).

The Court should grant summary judgment for Facebook for three reasons: (1) Facebook's alleged description of Ms. Loomer as "dangerous" and "promoting or engaging in hate" are statements of opinion and therefore not provably false; (2) Ms. Loomer cannot meet her heavy burden to show that Facebook acted with constitutional actual malice; and (3) Facebook's decision to remove Ms. Loomer from its platform is fully protected by the First Amendment and the Communications Decency Act, 47 U.S.C. § 230.[2]

### A. None of Facebook's Statements are Provably False as a Matter of Law.

Under the First Amendment, "there is no such thing as a false idea." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974). Accordingly, "statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions." *Turner*, 879 F.3d at 1262-63; *see also Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 717 (11th Cir. 1985) ("Opinions are protected from defamation actions by the first amendment."); *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995) (First Amendment shields "statements of opinion on matters of public concern that do not contain or imply a provable factual assertion"). This is because "[h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz*,

---

[2] Facebook bases its primary arguments on First Amendment principles; however, the elements of defamation relevant to this motion are substantially similar under both California and Florida law. *Compare Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (Florida law), *with* Cal. Civ. Code §§ 44-46 (California law).

7

418 U.S. at 339-40. "Whether the statement is one of fact or opinion [is a] question[] of law for the court." *Turner*, 879 F.3d at 1262-63; *see also Rodriguez v. Panayiotou*, 314 F.3d 979, 985-86 (9th Cir. 2002) ("[W]hether an allegedly defamatory statement constitutes fact or opinion is a question of law for the court to decide.").

Applying this principle, courts have long held that assertions of bigotry, racism, prejudice, and political extremism are in the eye of the beholder and therefore constitute subjective opinion that cannot be the basis for a defamation claim. *See, e.g.*, *Buckley v. Littell*, 539 F.2d 882, 893-95 (2d Cir. 1976) (description of plaintiff as a "fellow traveler" of "fascist[s]" and the "radical right" could not "be regarded as having been proved to be statements of fact . . . because of the tremendous imprecision of the meaning and usage of these terms in the realm of political debate"); *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 2:17-cv-566-MHT, 2019 WL 4547064, at *8 (M.D. Ala. Sept. 19, 2019) (designation of an organization as a "hate group" based on the organization's vocal opposition to homosexual conduct constituted non-actionable opinion because the term does not have "one precise definition, and instead may be ascribed multiple different meanings by 'the average reader'"), *appeal docketed*, No. 19-14125 (11th Cir. Oct. 18, 2019); *Ctr. for Immigration Studies v. Cohen*, No. CV 19-0087, 2019 WL 4394838, at *4 (D.D.C. Sept. 13, 2019) (designation of plaintiff as a "hate group" does not constitute a false statement of "fact," since "whether or not SPLC adhered to its definition to designate [plaintiff] to be a hate group is an entirely subjective inquiry"); *Stevens v. Tillman*, 855 F.2d 394, 402 (7th Cir. 1988) (allegation that plaintiff was a "racist" was not actionable).[3]

---

[3] *See also, e.g.*, *Edelman v. Croonquist*, No. 09-CV-1938, 2010 WL 1816180, at *6 (D.N.J. May 4, 2010) ("The . . . characterization of [plaintiffs] as racists is a subjective assertion, not sufficiently susceptible to being proved true or false to constitute defamation."); *Squitieri v. Piedmont Airlines, Inc.*, No. 3:17CV441, 2018 WL 934829, at *4 (W.D.N.C. Feb. 16, 2018) ("Statements indicating that Plaintiff is racist are clearly expressions of opinion that cannot be proven as verifiably true or

8

Accusations that a plaintiff is "dangerous" are similarly non-actionable as a matter of law. *See Del Fuoco v. O'Neill*, No. 8:09-CV-1262, 2011 WL 601645, at \*\*5–6 (M.D. Fla. Feb. 11, 2011) (statement that the plaintiff was "bizarre and dangerous" was protected opinion); *see also Stevens v. Mavent, Inc.*, No. SA CV 07-245, 2008 WL 2824956, at \*7 (C.D. Cal. July 21, 2008) (statement that plaintiff was "dangerous"); *Montgomery v. Risen*, 875 F.3d 709, 714 (D.C. Cir. 2017) (characterization of plaintiff's software as an "elaborate and dangerous hoax[]").

So too here. Facebook's use of the phrases "dangerous" and "promotes hate" are "so debatable, loose and varying" in meaning that they are "insusceptible to proof of truth or falsity." *Buckley*, 539 F.2d at 894. Ms. Loomer is, by her own admission, a controversial figure. She has called Islam a "cancer on society" and "cancer on humanity" and advocated laws prohibiting Muslims from serving in public office. SMF ¶ 6; Ex. 3 at 2. She has advocated a "non Islamic form of [U]ber or [L]yft" so she doesn't have to "support another Islamic immigrant driver." SMF ¶ 6; Ex. 6 at 1; Ex. 7 at 7. She has described herself as a "#ProudIslamaphobe" and called Muslims "savages" on Twitter. SMF ¶ 6; Ex. 4 at 2. And she has appeared with or expressed support for individuals who were previously banned by Facebook under its DIO policy for engaging in "organized hate." SMF ¶ 18; Ex. 17 at 3; Exs. 21–22. While Ms. Loomer may not believe she is

---

false."); *Smith v. Sch. Dist. of Phila.*, 112 F. Supp. 2d 417, 429 (E.D. Pa. 2000) (accusation that plaintiff was "racist and anti-Semitic" was not actionable because it was "merely non-fact based rhetoric"); *Jackson v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, No. 2:07-cv-461, 2009 WL 10704261, at \*39 (N.D. Ala. Feb. 23, 2009) (statement that plaintiff "was a 'racist' and a 'radical'" non-actionable); *Raible v. Newsweek, Inc.*, 341 F. Supp. 804, 807 (W.D. Pa. 1972) ("We hold that to call a person a bigot or other appropriate name descriptive of his political, racial, religious, economic or sociological philosophies gives no rise to an action for libel."); *McCaskill v. Gallaudet Univ.*, 36 F. Supp. 3d 145, 159 (D.D.C. 2014) (statement that plaintiff was "anti-gay" was non-actionable); *Ward v. Zelikovsky*, 643 A.2d 972, 983 (N.J. 1994) (accusation that plaintiffs "hate[d] . . . Jews" non-actionable); *Condit v. Clermont Cty. Rev.*, 675 N.E.2d 475, 478 (Ohio Ct. App. 1996) ("Numerous courts have concluded that allegations of fascism, anti-Semitism, or other accusations of ethnic bigotry are not actionable as defamation.") (collecting cases).

9

"dangerous" or has "promoted hate," others disagree—as demonstrated by her admission that online platforms have widely banned her. SMF ¶ 8. Where "different constituencies can hold different—and completely plausible—views of Plaintiff's actions, statements characterizing those actions constitute protected opinion." *McCaskill*, 36 F. Supp. 3d at 159 (reference to plaintiff as "anti-gay" was not actionable); *see also, e.g.*, *Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798, 810 (2002) (there can be no liability for "statements of the speaker's subjective judgment").

This doctrine applies with special force where, as here, the speaker outlines the basis for its opinion. Ms. Loomer admits Facebook explained it considers several factors in deciding whether someone has violated its DIO policy, including "whether the person has been identified with a hateful ideology" and "whether they have had pages or groups removed from Facebook for violating hate speech rules." Am. Compl. ¶ 8. Ms. Loomer does not and cannot claim that no one has associated her with hateful ideology, and admits that Facebook had previously suspended her account for 30 days. *Id.* ¶¶ 12-13. Moreover, Facebook provided examples of Ms. Loomer's actions that contributed to its decision to remove her account—specifically, that she publicly expressed support for Faith Goldy and Gavin McInnes, both of whom Facebook had banned. SMF ¶ 18. Under both California and Florida law, a statement constitutes protected opinion when it is based on disclosed facts that are not themselves actionable. *See Gardner v. Martino*, 563 F.3d 981, 987 (9th Cir. 2009) ("[W]hen a speaker outlines the factual basis for his conclusion, his statement is not defamatory and receives First Amendment protection."); *Turner*, 879 F.3d at 1262-63 (statement that coach engaged in "homophobic taunting" protected where it was based on facts that other players taunted plaintiff, coach knew about it, and coach gave plaintiff a male blow-up doll).

Nor can Ms. Loomer prevail on a claim that Facebook implied she was a "domestic terrorist" simply because Facebook's DIO policy *also* forbids "[t]errorist activity" in addition to "[o]rganized hate." Am. Compl. ¶¶ 9, 44. A plaintiff alleging defamation by implication must show not only that the alleged implication was "reasonable," but also that the speaker "intended to convey the defamatory implication." *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1063-64 (9th Cir. 1998); *see also Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993) (plaintiff must demonstrate that defendant "intend[ed] or endors[ed]" allegedly defamatory implication); *Rubin v. U.S. News & World Report, Inc.*, 271 F.3d 1305, 1309 n.11 (11th Cir. 2001) (noting heightened standard for libel by implication claims); *see also Klayman v. City Pages*, 650 F. App'x 744, 749 (11th Cir. 2016) ("[A]ll of the protections of defamation law . . . [are] extended to the tort of defamation by implication.").

Here, there is no evidence that Facebook intended or endorsed any implication that Ms. Loomer is a "domestic terrorist." As reported in the CNN Article, the factors that Facebook identified as relevant to its decision to remove Ms. Loomer's (and other individuals') accounts all concerned their involvement in "hate"—not terrorism. *See* SMF ¶ 16; Ex. 16 at 3. Similarly, the Civil Rights Audit that Ms. Loomer identifies in her complaint states that Facebook had removed Ms. Loomer because she "amplif[ied] or traffic[ked] in hate." SMF ¶ 19; Wong Decl., Ex. 2 at 10. The fact that the DIO policy contains a non-exhaustive, disjunctive list of conduct that could violate the policy does not imply that any individual whose account is suspended in fact engaged in all of that conduct. *See, e.g., Bartholomew v. YouTube, LLC*, 225 Cal. Rptr. 3d 917, 922 (Ct. App. 2017) (dismissing plaintiff's defamation claim arising from YouTube's statement that plaintiff's video violated its terms of service, which hyperlinked to a list of examples of violations—including "Sex and Nudity" and "Hate Speech"—noting that "'a reasonable reader

11

would not infer . . . that the [v]ideo contained the specific kinds of improper content mentioned' because the categories listed are described as '*examples*' to provide readers with further insight") (emphasis in original). This Court should not find, as Ms. Loomer urges, "a defamatory meaning which [Facebook's statements] do[] not convey to a lay reader." *Forsher v. Bugliosi*, 26 Cal. 3d 792, 803 (1980) (rejecting claim that a book defamed the plaintiff by repeatedly connecting him with events related to a murder); *see also Rubin*, 271 F.3d at 1308-09 (article discussing illegal practices found in the international gold trade did not state or imply that plaintiff, a gold refiner who was quoted in the article, engaged in such practices).

Finally, even if the Court considers the phrases "dangerous" and "promoting or engaging in hate" statements of fact, Ms. Loomer cannot carry her burden to prove they are false as applied to her. *See Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986) (plaintiff bears burden of proving falsity); *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (same). Given the public record of her controversial statements and actions—which she touts prominently on her own website—she cannot demonstrate that these descriptions are objectively false.

### B. Ms. Loomer Cannot Meet Her Burden to Show that Facebook Acted with Actual Malice.

Even if the Court could conclude that referring to Ms. Loomer as "dangerous" or "promot[ing] or engag[ing] in … hate" are statements of provably false fact, Ms. Loomer's claims *still* fail because she cannot show that Facebook made these statements with "actual malice."

The First Amendment imposes a heavy burden on public figures like Ms. Loomer who pursue defamation claims.[4] She must prove not only that the statement at issue is false and

---

[4] Ms. Loomer did not dispute that she is a public figure in response to Facebook's motion to dismiss. *See* ECF No. 25 at 14; ECF No. 29 at 7–9; ECF No. 31 at 6. *See also* Am. Compl. at 2 ¶¶ 1, 2 (describing herself as a "well-known conservative investigative journalist" and "conservative Jewish female activist"); *id.* ¶¶ 31, 38, 44 (reciting actual malice standard).

12

defamatory, but also that Facebook made it with constitutional "actual malice," that is "with 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991) (quoting *New York Times*, 376 U.S. at 279-80). "The standard of actual malice is a daunting one," *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996), and is necessary to guarantee the "national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times*, 376 U.S. at 270. Pursuant to this constitutional requirement, a public figure plaintiff must show by "clear and convincing" evidence that the defendant knew that the statements were false or entertained serious doubts as to their truth. *Anderson*, 477 U.S. at 255-57. Satisfying this standard imposes a "heavy burden" on plaintiffs, "far in excess of the preponderance sufficient for most civil litigation." *Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249, 1252 (9th Cir. 1997). As a result, courts routinely grant motions for summary judgment in public-figure defamation cases because the plaintiff cannot meet this high evidentiary standard.[5]

---

[5] *See, e.g., Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1241 n.33, 1243 (11th Cir. 1999) (insufficient evidence of actual malice where reporter stated "[the] truth is irrelevant to me" and knew there was a "[d]ifference of opinion as to the truth" of the allegations); *Tucker v. Fischbein*, 237 F.3d 275, 286 (3d Cir. 2001) (Alito, J.) (insufficient evidence of actual malice despite contentions that defendant engaged in "poor journalistic practices," had "a preconceived story line," and "failed to conduct a thorough investigation"); *Lohrenz v. Donnelly*, 350 F.3d 1272, 1284, 1286 (D.C. Cir. 2003) (insufficient evidence of actual malice where plaintiff offered evidence that defendants "acted on the basis of a biased source and incomplete information," relied upon portions of plaintiff's records but did not seek out the full documents, and were told by other sources that the conclusion about plaintiff was wrong and sources were "working their own agenda"); *Gray v. St. Martin's Press*, 221 F.3d 243, 252 (1st Cir. 2000) (insufficient evidence of actual malice where defendant relied on sources with "an axe to grind" against plaintiff, failed to "seek out decisive witnesses" who would "have denied" the allegations, and failed to publish statements favorable to plaintiff). Indeed, the Eleventh Circuit has recognized that summary dismissal of public-figure libel cases is particularly appropriate because "there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016). *See also Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966) ("In the First

The actual malice standard focuses exclusively on the defendant's *subjective* state of mind "at the time of publication." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512 (1984). "[K]nowledge of falsity is self-explanatory" and requires proof that the defendant was actually, subjectively aware that the statement was false when it was published. *Silvester v. Am. Broad. Cos., Inc.*, 839 F.2d 1491, 1498 (11th Cir. 1988). To establish that a defendant published a statement with "reckless disregard" for the truth, a plaintiff must show "that the defendant actually had a 'high degree of awareness of . . . probable falsity.'" *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) (citation omitted). "Reckless disregard" is not measured "by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). "Mere negligence does not suffice" for actual malice, *Masson*, 501 U.S. at 510, nor does even "an extreme departure from professional standards." *Harte-Hanks*, 491 U.S. at 665. Instead, "[t]here must be sufficient evidence to permit the conclusion that the defendant *in fact entertained serious doubts as to the truth of his publication*." *St. Amant*, 390 U.S. at 731 (emphasis added). Moreover, to the extent Ms. Loomer asserts a claim for defamation by implication, she has the added burden of showing by clear and convincing evidence that Facebook "intended to convey" the implication she identifies. *Dodds*, 145 F.3d at 1063-64. *See also Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309, 1318 (7th Cir. 1988) ("[W]here the plaintiff is claiming defamation by innuendo, [s]he also must show with clear and convincing evidence that the defendants intended or knew of the implications that the plaintiff is attempting to draw from the allegedly defamatory material.").

Here, because she failed to serve any discovery requests or take any depositions, Ms.

---

Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate.").

14

Loomer cannot point to *any* evidence in the record—let alone "clear and convincing" evidence—that Facebook *knew* it was false to describe her as "dangerous" or "promoting or engaging in hate." Ms. Loomer's conclusory allegation that Facebook "knew that Ms. Loomer had never once promoted or engaged in violence and hate, and that Ms. Loomer was not a 'dangerous' individual" (Am. Compl. ¶ 19), unsupported by any affirmative evidence, cannot withstand a motion for summary judgment. *Anderson*, 477 U.S. at 256-57.[6]

Moreover, the examples of Ms. Loomer's conduct provided by Facebook—that Ms. Loomer had appeared with Gavin McInnes and expressed support for Faith Goldy, both of whom were previously banned by Facebook for violating its DIO policy against "organized hate"—support Facebook's determination that Ms. Loomer violated its policy. SMF ¶ 18. And the undisputed fact that numerous other online platforms—including Twitter, Uber, Lyft, PayPal, and Venmo—have banned Ms. Loomer from using their services based on her widely reported anti-Muslim public statements and similar actions makes clear that, at a minimum, there is a reasonable basis for people to conclude that she has engaged in or promoted what can reasonably be considered "hate." *Id.* ¶¶ 7–8. Where, as here, allegedly defamatory statements are "one of a

---

[6] Ms. Loomer has publicly claimed that Facebook and other platforms have banned her due to "bias" against conservatives and as a result of her personal political views. *See, e.g.,* Ex. 14 at 1-2 (claiming "big tech social media companies are conspiring with the Left to ban Conservatives" and asserting that "[s]elf hating Jew Mark Zuckerberg" removed her from Facebook "for being a pro-Israel Jew" who "voted for Donald Trump"); Ex. 13 at 1 (describing ban from Twitter and temporary ban from Facebook in 2018 as an "example of collusion by tech giants to censor conservative voices"). These alleged accusations of "bias," even if they were in the record, would also fail to demonstrate actual malice, since "the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte-Hanks*, 491 U.S. at 666. *See also, e.g.*, *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1198 n.17 (11th Cir. 1999) ("Ill-will, improper motive or personal animosity plays no role in determining whether a defendant acted with 'actual malice'"); *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 92 (D.D.C. 2019) (dismissing complaint for failure to plead actual malice where plaintiff alleged defendants were motivated by political bias, explaining that "[a]llegations of 'leftist enmity' cannot trump the guarantees of the First Amendment").

number of possible rational interpretations" of a situation that "bristle[s] with ambiguities," there can be no finding of actual malice because it is not possible to prove the defendant knew *its* interpretation was objectively false. *Time, Inc.*, 401 U.S. at 290; *see also CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 296 (4th Cir. 2008) (no actual malice where defendant adopted one of at least two "rational interpretations" of facts); *Mason v. Harter*, 60 F. App'x 690, 691 (9th Cir. 2003) (plaintiff could not show that defendant acted with actual malice in calling him a "bigot" where plaintiff's statements could be "fairly characterized as exhibiting intolerant views of lesbian, bisexual, gay, and transgender people as a group" and therefore provided a "reasonable basis" for defendant's conclusion).

### C. The First Amendment and Section 230 of the Communications Decency Act Protect Facebook's Decision to Remove Ms. Loomer's Accounts.

At bottom, Ms. Loomer's lawsuit reflects her disagreement with Facebook's decision to disable her accounts. Ms. Loomer alleges that "[i]n issuing the ban against Ms. Loomer," Facebook "publicly designated her as 'dangerous.'" Am. Compl. ¶ 7; *see also, e.g.*, *id.* ¶ 24 ("The Miami Herald article even cites the fact that Plaintiff Loomer was banned from Defendant Facebook. Defendant Facebook is therefore, in effect, re-libeling her."). Tellingly, she alleges no harm stemming from Facebook's *statements*, as distinct from its decision to ban her. To the extent Ms. Loomer targets Facebook's decision to remove her from its platform, her claims fail.

The First Amendment protects Facebook's decision to disable Ms. Loomer's accounts. "[O]nline publishers have a First Amendment right to distribute others' speech and exercise editorial control on their platforms." *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991-22 (S.D. Tex. 2017); *see also, e.g.*, *Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 438-39 (S.D.N.Y. 2014) (when online platforms "select and arrange others' materials, and add the all-important ordering that causes some materials to be displayed first and others last, they are

16

engaging in fully protected First Amendment expression"); *Prager Univ. v. Google LLC*, 951 F.3d 991, 999 (9th Cir. 2020) (holding that the First Amendment "preclude[d] constitutional scrutiny of YouTube's content moderation pursuant to its Terms of Service and Community Guidelines"). For example, in *e-ventures Worldwide, LLC v. Google, Inc.*, No. 2:14-cv-646, 2017 WL 2210029, at *4 (M.D. Fla. Feb. 8, 2017), the court dismissed a claim premised on Google's removal of the plaintiff's websites from search engine results because the plaintiff had allegedly violated Google's policies. The court held that the First Amendment "protects these decisions, whether they are fair or unfair, or motivated by profit or altruism." *Id.* Accordingly, in Ms. Loomer's prior lawsuit against Facebook, the court held that "selective censorship" "is not actionable under the First Amendment unless perpetrated by a state actor." *Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30, 41 (D.D.C. 2019). The same is true here.

Section 230 of the Communications Decency Act, 47 U.S.C. § 230, also protects Facebook's decision. With limited exceptions not relevant here, Section 230(c) prohibits all civil claims against an online publisher, such as Facebook, premised on treating it as a "publisher" of third-party content, including claims based on its decisions to remove or restrict access to third-party content that it considers to be "objectionable." *See Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006). Indeed, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008). Accordingly, courts have repeatedly held that a social media platform's decision to deny, suspend, or remove user accounts is immunized from liability by Section 230. *See, e.g.*, *Mezey v. Twitter, Inc.*, No. 1:18-CV-21069-KMM, 2018 WL 5306769, at *1 (S.D. Fla. July 19, 2018) (Section 230 barred claims against Twitter for suspending plaintiff's account); *Fed. Agency of*

17

*News LLC v. Facebook, Inc.*, No. 18-CV-07041-LHK, 2020 WL 137154, at *9 (N.D. Cal. Jan. 13, 2020) (Section 230 barred claims against Facebook for removing plaintiff's account and page); *King v. Facebook, Inc.*, No. 19-CV-01987-WHO, 2019 WL 4221768, at *1 (N.D. Cal. Sept. 5, 2019) (same).[7] The same result should apply here.

## IV. CONCLUSION

For the foregoing reasons, Facebook respectfully requests that the Court grant its motion for summary judgment and dismiss all claims against it.

## REQUEST FOR A HEARING

In accordance with Local Rule 7.1(b)(2), Facebook requests a hearing focused on the legal issues raised by this motion.

Dated: April 10, 2020

                                                                    s/Brian W. Toth
                                                                     GELBER SCHACHTER & GREENBERG, P.A.
Brian W. Toth
Florida Bar No. 57708
Natalia B. McGinn
Florida Bar No. 1011385
1221 Brickell Avenue, Suite 2010
Miami, Florida 33131
Phone: (305) 728-0965
btoth@gsgpa.com
nmcginn@gsgpa.com

DAVIS WRIGHT TREMAINE LLP
Laura R. Handman*
Alison Schary*

---

[7] *See also, e.g., Brittain v. Twitter, Inc.*, No. 19-CV-00114-YGR, 2019 WL 2423375, at *5 (N.D. Cal. June 10, 2019) (Section 230 barred claims against Twitter for suspending plaintiff's account); *Riggs v. MySpace, Inc.*, 444 F. App'x 986, 987 (9th Cir. 2011) (Section 230 "immunizes decisions to delete user profiles"); *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 157 (E.D.N.Y. 2017) ("Facebook's choices as to who may use its platform are inherently bound up in its decisions as to what may be said on its platform, and so liability imposed based on its failure to remove users would equally derive[ ] from [Facebook's] status or conduct as a 'publisher or speaker.'"), *aff'd in part, dismissed in part sub nom. Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019).

Chelsea T. Kelly*
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC 20006
Phone: (202) 973-4224
laurahandman@dwt.com
alisonschary@dwt.com
chelseakelly@dwt.com

*Admitted pro hac vice*

*Counsel for Defendant Facebook, Inc.*

19